OPINION OF THE COURT
Michael D. Stallman, J.
In this action to abate a public nuisance, the City of New York seeks, among other things, to enjoin defendants, which are owners of apartment hotels on the Upper West Side, from renting to tourists or other transients. At issue is whether such use in a residential neighborhood is illegal, violative of the zoning laws, and constitutes a public nuisance.
The City of New York, the Department of Buildings (DOB) and the Department of Housing Preservation and Development (HPD) (collectively, the City) move, pursuant to Administrative Code of the City of New York §§ 7-707, 7-710, 26-120 (b); § 26-126 (c); § 26-246 (d) and § 27-2121, and pursuant to CPLR article 63, to preliminarily enjoin the defendants from permitting transient use and/or occupancy of any of the units in the defendant buildings, located at 315 West 94th Street (the Mont-royal), 316 West 95th Street (the Pennington) and 330 West 95th Street (the Continental) (collectively, the subject buildings), from performing renovations on the subject buildings without filing plans and obtaining the proper permits, and for an order directing defendants to abate any violations of the Building Code and Housing Maintenance Code. The City also seeks the appointment of a temporary receiver to oversee the subject buildings.
Pursuant to CPLR 3211 (a) (1) and (7), defendants cross-move to dismiss the first, second and fourth causes of action in the complaint.
Background
The three subject buildings are all located on the Upper West Side of Manhattan in a part of New York City that the New *383 York City Zoning Resolution designates as an R8 general residence zoning district. The certificates of occupancy for the Continental and Montroyal state that they are seven-story class A multiple dwelling single-room occupancy old law tenements (Sept. 5, 2007 Rand affidavit exhibits 1, 2); the certificate of occupancy for the Pennington describes it as a seven-story single-room occupancy new law tenement[1] (Sept. 5, 2007 Rand affidavit exhibit 3).
In or about July and early August 2007, the City inspected each of the subject buildings and discovered that, although some permanent residential tenants occupy certain rooms, many rooms were being rented to transients and that the buildings were effectively used as transient hotels or hostels, allegedly in violation of both the certificates of occupancy for the buildings and the Zoning Resolution. Defendants do not dispute that they advertised the subject buildings on Internet travel sites such as Orbitz, Expedia, Hotels.com and Yahoo Travel as inexpensive transient accommodations available to tourists (Sept. 5, 2007 Rand affidavit exhibit A).
In addition, the inspectors discovered that extensive alterations, construction work and plumbing work had been completed, or was being performed, in each of the buildings without approved plans or permits. For example, the inspectors discovered, among other things, that the defendants had constructed a bridge connecting the Montroyal and the Pennington. Defendants had constructed a passageway through the load bearing walls of the Continental and Pennington, and as a result there was no structural fire division between those two buildings (Aug. 8, 2007 Mungin affidavit).
The City issued five violations to the Montroyal, eight violations to the Continental and five violations to the Pennington for improper occupancy and improper renovations and construction (Aug. 8, 2007 Mungin affidavit exhibits A-S). According to the complaint, the defendants failed to remedy any of the violations relating to either the alleged illegal occupancy or the renovations.
On September 6, 2007, the City commenced this action seeking a preliminary injunction and presented a proposed order to show cause seeking a temporary restraining order (TRO) to *384 enjoin the use of the subject buildings as transient hotels/hostels and to enjoin continued alteration/construction work until defendants filed plans and obtained permits for such work. The City also seeks an order directing defendants to remove all construction/alteration work performed without proper permits and an order appointing a temporary receiver.
Later on September 6, 2007, after a conference with counsel for each side, the court issued a TRO enjoining defendants, as of September 20, 2007,[2] from permitting the transient occupancy of any rooms in the subject buildings, other than those so occupied on that date. Effective immediately, the court enjoined defendants from making reservations for transient occupancy at any of the subject buildings and from making alterations or changes in the legal configuration of the subject buildings without the proper permits and a certificate of no harassment. The court made the order to show cause returnable on September 20, 2007 and noted that “TRO may be revisited on the return date.”
On September 20, 2007 the court conducted a conference with counsel for the parties, and, on September 21, 2007, the court heard oral argument on the order to show cause. Based on that oral argument, and given the arcane legal issues, and the lack of an immediate danger to life, health or safety posed solely by the transient use, and to avoid harm and inconvenience to blameless, nonparty tourists, the court modified the TRO to vacate those portions of the TRO that prohibited defendants from renting rooms in the subject buildings on a transient basis or from making new reservations to rent the rooms on a transient basis. The remainder of the TRO was extended pending determination of the City’s motion for a preliminary injunction.
Contentions
In support of its motion for a preliminary injunction, the City asserts that all three of the buildings are class A buildings (which, pursuant to the Multiple Dwelling Law, may be occupied only as permanent residences) that are being used in violation of the certificates of occupancy. While the City considers the buildings to be apartment hotels (permitted by the Zoning Resolution in an R8 general residence district), it contends that *385 they are actually being operated as transient hotels (not permitted in an R8-zoned area).
The City also contends that defendants have not adequately addressed the Building Code violations, including, but not limited to, the installation of bathrooms and kitchens, reconfiguration of units, changes to plumbing, the installation of a bridge between two of the buildings and the destruction of the structural fire division between the bearing walls of two of the buildings.
In opposition to the order to show cause and in support of the cross motion to dismiss the first, second and fourth causes of action in the complaint which seek to enjoin the allegedly illegal occupancy and the unauthorized alterations and construction, defendants argue that, pursuant to the 1916 Zoning Resolution, hotels were permitted in residence districts; according to defendant HPD’s Initial Inspection Cards (I cards) for each of the subject buildings, the buildings have a long history of use as transient hotels/hostels; because this transient use predates the City’s 1961 Zoning Resolution, the transient use is a permitted nonconforming use that is grandfathered under section 52-11 of the Zoning Resolution.
Alternatively, the defendants argue that even if the buildings are not grandfathered under the Zoning Resolution the request for an injunction is vague and overbroad because the City has not defined the term “transient”; that the Multiple Dwelling Law states that units in class A multiple dwellings may be rented for short term, one week rentals; and that the City has not shown that the subject buildings are not primarily used for long term residents. Moreover, defendants contend that some transient uses are permitted in R8 general residence districts.
Defendants also argue that the City has not demonstrated by clear and convincing evidence that they are entitled to an injunction because the transient use has existed for decades and there is no evidence that the continued use of the buildings as transient hotels/hostels constitutes an emergency that poses a risk to public health, safety or welfare. In addition, defendants contend that they would be irreparably injured by the loss of revenue and reputation that they would experience as a result of the injunction. They also claim that the appointment of a temporary receiver is unnecessary under the circumstances, in particular because the building and fire code violations are being addressed and remedied.
*386 Statutory Framework
A. The Nuisance Abatement Law
The City’s Nuisance Abatement Law (Administrative Code of City of NY § 7-701 et seq.) declares that certain types of activities and violations constitute “public nuisances” including, among other things:
“[T]he use or alteration of property in flagrant violation of the building code, zoning resolution, . . . multiple dwelling law . . . which interfere [s] with the interest of the public in the quality of life and total community environment, the tone of commerce in the city, property values and the public health, safety, and welfare” (Administrative Code § 7-701).
Pursuant to Administrative Code § 7-703 (d), any building which is in violation of certain enumerated portions of the Building Code, including those portions of the Code that prohibit alteration of the use and occupancy without the proper permits and in violation of the certificate of occupancy, constitutes a public nuisance.
In addition, pursuant to Administrative Code § 7-703 (k), any building “wherein there exists or is occurring a violation of the zoning resolution” is declared a public nuisance.
B. The Building Code
The New York City Building Code sets forth the “reasonable minimum requirements and standards ... for the regulation of building construction in the city of New York in the interest of public safety, health and welfare, and with due regard for building construction and maintenance costs” (Administrative Code § 27-102).
The Building Code applies to “the construction, alteration, repair, demolition, removal, maintenance, occupancy and use of new and existing buildings in the city of New York.” (Administrative Code § 27-103.) Administrative Code § 27-217 states that no change can be made in the occupancy or use of an existing building that is inconsistent with the last issued certificate of occupancy of the building.[3]
*387 Administrative Code §§ 27-138 and 27-147 state that no building, construction, alteration or plumbing work may be commenced until a written permit has been issued, pursuant to the filing and approval of the appropriate application and plans.
Section 27-198 details the process for approval of plans for alteration of single-room occupancy multiple dwellings. That section defines single-room occupancy multiple dwelling to mean:
“[EJither a class A multiple dwelling used in whole or in part as a rooming house or furnished room house or for single room occupancy pursuant to section two hundred forty-eight of the multiple dwelling law or containing rooming units, as such term is defined in section 27-2004 of the housing maintenance code or a class B multiple dwelling” (Administrative Code § 27-198 [a]).
That section also provides, inter alia, that DOB shall not issue an alteration permit or approve the addition or removal of kitchen or bathroom facilities in a single-room occupancy (SRO) unless HPD has issued a certificate that there has been no harassment of the lawful occupants and the owners submit a sworn statement that they will not harass the lawful occupants during the alterations.
C. The Multiple Dwelling Law
Multiple Dwelling Law § 4 (8) (a) states:
“A ‘class A’ multiple dwelling is a multiple dwelling which is occupied, as a rule, for permanent residence purposes. This class shall include tenements, flat houses, maisonette apartments, apartment houses, apartment hotels, bachelor apartments, studio apartments, duplex apartments, kitchenette apartments, garden-type maisonette dwelling projects, and all other multiple dwellings except class B multiple dwellings.”
Multiple Dwelling Law § 248 (1) states that a dwelling occupied for single-room occupancy pursuant to that section shall be deemed a class A multiple dwelling. Multiple Dwelling Law § 4 (16) provides that, when a class A multiple dwelling is used *388 in whole or in part for single-room occupancy, it remains a class A multiple dwelling. Multiple Dwelling Law § 248 (16) states that it is unlawful to rent a room in a single-room occupancy dwelling for less than a week.
Multiple Dwelling Law § 4 (9) defines a “class B” multiple dwelling as a multiple dwelling which is occupied “transiently, as the more or less temporary abode of individuals or families who are lodged with or without meals.” Class B multiple dwellings include transient hotels, lodging houses, rooming houses and college and school dormitories.
D. The City’s Zoning Resolution
The Zoning Resolution of the City of New York regulates the location of buildings designated for specific uses within the City of New York (NY City Zoning Resolution § 11-01). It divides the City into districts including residence, commercial and manufacturing districts. Zoning Resolution § 11-12 established R8 districts as general residence districts.
Zoning Resolution § 22-00 provides that Use Groups 1, 2, 3 and 4 are permitted in residence districts. Use Group 2 consists of all types of permanent residential developments, including “apartment hotels” (Zoning Resolution § 22-12 [A]). An “apartment hotel” is “a ‘building’ or part of a ‘building’ in which: (a) the ‘dwelling units’ or ‘rooming units’ are used primarily for permanent occupancy” (Zoning Resolution § 12-10). By contrast, a “transient hotel” is “a ‘building’ or part of a ‘building’ in which: (a) living or sleeping accommodations are used primarily for transient occupancy, and may be rented on a daily basis” (ibid.). Transient hotels are included within Use Group 5 and are permitted only in commercial districts (Zoning Resolution § 32-14).
Zoning Resolution § 12-10 defines a nonconforming use as “any lawful ‘use’ . . . of a building . . . which does not conform to any one or more of the applicable ‘use’ regulations of the district in which it is located, either on December 15, 1961 or as a result of any subsequent amendments thereto.”
Zoning Resolution § 52-11 states that a use of property that is no longer authorized due to rezoning, but lawfully existed prior to the enactment of the existing zoning ordinance, is a permitted “nonconforming use.” The right to continue such nonconforming use is lost if there is a discontinuance of substantially all of the nonconforming activity for a period of at least two years (Zoning Resolution § 52-61).
*389 Procedural Matters
Standard of Proof
The City commenced this action pursuant to the Nuisance Abatement Law on the ground that defendants’ purported use of the buildings as transient hotels/hostels is a violation of the Zoning Resolution, which constitutes a public nuisance (Administrative Code § 7-703 [k]). Both sides agree that section 7-707 (a) of the Administrative Code provides that a temporary restraining order may be granted, pending a hearing, only if it appears by “clear and convincing evidence that a public nuisance ... is being conducted, maintained or permitted.” However, contrary to defendants’ view, the Nuisance Abatement Law does not require application of the “clear and convincing evidence” standard for the issuance of a preliminary injunction (see Administrative Code § 7-707). With regard to preliminary injunctions, Administrative Code § 7-707 (a) uses precatory language, providing that the court “may grant a preliminary injunction” without defining the standard of proof the court must consider. As discussed below, it is well-settled law that a movant need only demonstrate that it is likely that he or she will succeed on the merits of the action to satisfy one prong of the three-prong test for a preliminary injunction. Accordingly, it appears that the “preponderance of the evidence” standard is applicable to preliminary injunctions relating to a public nuisance whether under the City’s Nuisance Abatement Law or the CPLR (see e.g. New York ex rel. Spitzer v Cain, 418 F Supp 2d 457 [SD NY 2006]).
The Traditional Three-Prong Test for a Preliminary Injunction
A party seeking a preliminary injunction under CPLR article 63 must establish (1) likelihood of success on the merits, (2) irreparable injury absent the relief, and (3) a balance of the equities in its favor (W.T. Grant Co. v Srogi, 52 NY2d 496 [1981]; Albini v Solork Assoc., 37 AD2d 835 [2d Dept 1971] [the “three prong test”]). The City argues that the three-prong test does not apply to preliminary injunctions pursuant to the Nuisance Abatement Law, citing City of New York v Bilynn Realty Corp. (118 AD2d 511, 512 [1st Dept 1986]). More recently, the Appellate Division, First Department, has made it clear that the traditional three-prong test applies:
“Inasmuch as defendants’ violation of the Zoning Resolution constituted a public nuisance (Administrative Code of City of NY § 7-703), plaintiffs were entitled to seek preliminary injunctive relief (§ 7- *390 707). Such relief is available where the plaintiff is able to demonstrate a likelihood of ultimate success on the merits, irreparable injury if the provisional remedy is not granted, and a balancing of the equities in the plaintiffs favor. Here, plaintiffs have demonstrated the likelihood of prevailing, the irreparable injury is based upon the harm to the general public if the nuisance is not immediately abated” (City of New York v Love Shack, 286 AD2d 240, 242 [1st Dept 2001] [citations omitted]).
The City’s reliance on City of New York v Bilynn Realty Corp. is misplaced. As the City indicates, the Appellate Division, First Department, stated in Bilynn Realty, “The three-pronged test for injunctive relief does not apply” (118 AD2d at 512). However, this statement is taken out of context. The court stated, “The three-pronged test for injunctive relief does not apply; no special damage or injury to the public need be alleged; and commission of the prohibited act is sufficient to sustain the injunction” (ibid.). The court went on to say “that a balancing of equities does not favor the defendants” (id. at 514). When Bilynn Realty is viewed in its full context, the City has the burden of establishing a likelihood of success (i.e., a likelihood of proving the existence of a public nuisance) and a balancing of the equities. Irreparable injury is presumed from the existence of the public nuisance if not remedied, as Love Shack clarifies. This framework is consistent with the decisions of the Appellate Division, Second Department (see First Franklin Sq. Assoc., LLC v Franklin Sq. Prop. Account, 15 AD3d 529 [2d Dept 2005]; Village of Chestnut Ridge v Roffino, 306 AD2d 522, 524 [2d Dept 2003]; City of New York v Falack, 175 AD2d 853 [2d Dept 1991]; see also City of New York v West Winds Convertibles Intl., Inc., 16 Misc 3d 646, 652 [Sup Ct, Kings County 2007] [“(t)o obtain preliminary injunctive relief based on a violation of its zoning ordinances, a town need only show . . . likelihood of ultimate success on the merits and that the equities are balanced in its favor”]; City of New York v Scandals, 178 Misc 2d 267 [Sup Ct, Queens County 1998] [applying standards for preliminary injunction, including three-prong test, under CPLR article 63]).
Preliminary Injunction
Likelihood of Success on the Merits
Here, the City has made a prima facie showing that it is likely to succeed on the merits in this action because the use of the *391 subject buildings as transient hotels violates both the certificates of occupancy for the subject buildings and the 1961 Zoning Resolution.[4]
The certificates of occupancy for each of the subject buildings establish that they are class A buildings which are “occupied as a rule for permanent residence purposes.”[5] Each certificate of occupancy was issued before the enactment of the 1961 Zoning Resolution; therefore, the legal use for each building before 1961 was as a class A permanent residence. Accordingly, even if, as defendants contend, transient hotels were permitted in residence districts prior to 1961, the use of the subject buildings as transient hotels was in violation of their certificates of occupancy, and therefore a violation of the Building Code. When the use of the buildings as transient hotels violated the Building Code prior to 1961, then the grandfathering provision of Zoning Resolution § 52-11 does not apply to the buildings because that section states that, to be grandfathered, the building’s use prior to 1961 must have *392 been lawful.[6] In light of the buildings’ unlawful use when the 1961 Zoning Resolution was adopted, the subject transient use was not grandfathered; defendants are thus in violation of the 1961 Zoning Resolution because transient hotels/ hostels are not permitted in R8 residence districts.
Defendants’ reliance on the I cards to establish that the buildings were legally used as class B transient hotels prior to 1961 is without merit. The HPD Web site explains:
“Before 1938, the [predecessor agency of the] Department of Housing Preservation and Development (HPD) used T cards (T stands for initial inspection) to record the occupancy and arrangement of the buildings HPD[‘s predecessor] inspected. Certificates of Occupancy were not required until 1938. Today, absent a Certificate of Occupancy, the Department uses I-cards to determine the legal use and occupancy of a Building” (http://www.nyc.gov/ html/hpd/html/owners/faqs-for-res-owners.shtml).
Here, each of the subject buildings has a valid certificate of occupancy which determines the legal use and occupancy of the building (NY City Charter § 645 [b] [3] [e]; Administrative Code § 27-217). An I card, by its nature, does not and cannot amend or supercede the certificate of occupancy. An I card does not determine the legality of an existing use or occupancy. Rather, it may provide evidence of the inspector’s observations and thus of the nature of the use or occupancy, whether legal or not.
None of the certificates of occupancy for these buildings identifies any of the units as class B units. The I cards, which describe some of the units in the subject buildings as class B or transient residences, provide evidence that, before the 1961 Zoning Resolution, the buildings were being used in a manner that was inconsistent with their certificates of occupancy. At no time did the owners attempt to apply to the City for an amended certificate of occupancy to permit transient (i.e., nonclass A) use.
Moreover, defendants’ argument that the City has failed to show that the buildings are not primarily used as permanent residences is similarly unavailing. Although the language of *393 Multiple Dwelling Law § 4 (8) (a), which defines a “class A multiple dwelling,” and Zoning Resolution § 12-10, which defines “apartment hotel,” appear to permit some minimal transient use of a class A building that is being used as an apartment hotel, the defendants’ own submissions demonstrate that a significant portion of each of the buildings is being used for transient occupancy. According to defendants’ own submissions, defendants’ transient use of the units within the hotels is not merely incidental to defendants’ use of the buildings as permanent residences. According to George Dfouni, the director of marketing[7] for the subject buildings, “the hotels currently have in excess of 2,000 reservations for rooms outstanding for dates subsequent to September 20, 2007” (Dfouni affidavit ¶ 13). He also states that “[a]ny prohibition against offering short-term accommodations would have a substantial adverse impact on the business of the Hotels by depriving the hotels of significant revenues amounting to hundreds of thousands of dollars necessary to carry on their business.”
Irreparable Injury
The City has established irreparable injury based on the harm to the permanent residents in the subject buildings, the surrounding community and the general public if the nuisance is not abated (City of New York v Love Shack, 286 AD2d at 242; see People ex rel. Bennett v Laman, 277 NY 368, 383-384 [1938] [in dicta, indicating that there is a presumption of irreparable injury whenever there is a violation of a statute that expressly authorizes injunctive relief]). Here, there is evidence that the transient guests disrupt the normal building operations and disturb the permanent residents. The alterations, which were apparently undertaken without proper permits (and which are being administratively adjudicated based on pending issued violations), adversely affect the health, safety and welfare of the inhabitants in the subject buildings (see e.g. Matter of La Trieste Rest. & Cabaret v New York State Liq. Auth., 249 AD2d 156 [1st Dept 1998]).
Defendants claim that they, and their nonparty customers, not the City, would suffer irreparable injury if injunctive relief is granted. Defendants allege that they would lose hundreds of thousands of dollars in revenue and would be forced to dishonor *394 over 2,000 reservations that have been booked through third-party providers.
It is well settled that damages compensable in money and capable of calculation, although with some difficulty, do not constitute irreparable injury (Scotto v Mei, 219 AD2d 181, 184 [1st Dept 1996]; SportsChannel Am. Assoc. v National Hockey League, 186 AD2d 417, 418 [1st Dept 1992]; see also Putter v City of New York, 27 AD3d 250, 253 [1st Dept 2006]). Assuming, for purposes of argument, that, if defendants were ultimately to prevail, the damages they allege from the loss of reservations would be calculable and compensable in money damages. Defendants would have an adequate remedy at law.
Moreover, because substantially all of the reservations were made through third-party Internet providers, defendants can contact those providers and request, based on the order of this court, that the providers contact the parties who have made the reservations so that the reservations can be cancelled and, if possible, rebooked with other hotels.[8]
Balance of the Equities
A balancing of the equities requires that the motion be granted if the harm the movant would suffer absent the injunction is greater than the harm to be imposed on the opponent by the injunction (Fischer v Deitsch, 168 AD2d 599 [2d Dept 1990]).
The City has demonstrated that the defendants have violated the Zoning Resolution by operating transient hotels/hostels in an R8 general residence district and that the defendants are not eligible for the grandfathering provision of the Zoning Resolution. The City has the right to enforce its Zoning Resolution for the benefit of the community and the health, safety and welfare of the permanent residents and the public at large.[9] As discussed *395 above, neither the defendants nor the prospective hotel guests will suffer an irreparable injury given the court’s crafting of the injunction, so as to minimize the impact on the tourists who intend to travel to our City (see n 8, supra). Defendants’ monetary losses, if any, would be compensable in money damages.[10]
Accordingly, it appears that the equities balance in the City’s favor.
Other Relief
The City already issued violations concerning, among other things, renovations, construction, fire safety and plumbing, and is proceeding to adjudicate them administratively. The pen-ties indicated that the defendants and the appropriate administrative agencies are working together to resolve those violations. Thus, the court need not now intervene in these matters except to enjoin any further construction, alteration or plumbing work until defendants have filed the appropriate plans and acquired the appropriate permits and/or until defendants have exhausted their administrative remedies. The administrative process appears adequate to adjudicate and correct any other code violations; there appears to be no need for additional injunctive relief.[11]
The request for a temporary receiver is denied. The City has failed to show that the injunction is not adequate to protect the subject buildings, the permanent residents and the public interest.
Conclusion
The City has met its burden of demonstrating entitlement to injunctive relief both under the CPLR and the Administrative *396 Code.[12] The transient use of the subject buildings is illegal as violative of the certificates of occupancy and the Zoning Resolution.
Accordingly, it is ordered that the City’s motion for a preliminary injunction is granted to the extent provided herein; it is ordered that, upon service of a copy of this order with notice of entry, defendants are enjoined from making any new reservations for transient occupancy (defined as for a period of less than 30 days) at the subject buildings, pending final determination of this action; and it is further ordered that, as of January 8, 2008, pending final determination, defendants are enjoined from using or occupying or permitting the use or occupancy of any of the units at the subject buildings for transient use and/or as transient hotels and hostels, other than the units so occupied on that date; and it is further ordered that defendants are enjoined from changing the legal configuration of any of the subject buildings or making any alterations to the subject buildings unless and until a permit is obtained from the City’s Department of Buildings; and it is further ordered that defendants are enjoined from removing bathroom or kitchen facilities and from altering the configuration of or the use or occupancy of any portion of the subject single-room occupancy multiple dwellings unless and until a certification of no harassment has been issued by the City’s Department of Housing Preservation and Development and a permit has been issued by the Department of Buildings permitting such alteration; and it is further ordered that the branch of plaintiffs motion for a temporary receiver is denied; and it is further ordered that defendants’ cross motion to dismiss the first, second and fourth causes of action is denied; and it is further ordered that defendants shall serve and file an answer to the complaint within 30 days of service with a copy of this order with notice of entry.

. Although the certificate of occupancy for the Pennington does not specifically state that it is a class A building, Multiple Dwelling Law § 4 (8) (a) includes tenements in the definition of class A buildings.

. By a so-ordered stipulation dated September 20, 2007, the TRO was extended to September 21, 2007.

. In addition, New York City Charter § 645 (b) (3) (e) provides: “[EJvery certifícate of occupancy shall, unless and until set aside, vacated or modified ... be and remain binding and conclusive upon all agencies and officers of the city, ... as to all matters therein set forth, and no order, direction or requirement affect *387 ing or at variance with any matter set forth in any certificate of occupancy shall be made or issued by any agency or officer of the city . . . unless and until the certificate is set aside, vacated or modified . . . .”

. Prior to the current 1961 Zoning Resolution, section 3 (1) of the City’s 1916 Zoning Resolution, as amended, permitted hotels with 30 or more sleeping units in residence districts.

. Although the Multiple Dwelling Law does not define the terms “permanent residence” or “transient use,” the Department of Buildings relies on provisions in the Building Code, Administrative Code §§ 27-264 and 27-265, which define residential occupancies; it has consistently interpreted transient or class B occupancy requirements to allow for occupancies of less than 30 days, and permanent or class A occupancy requirements to allow for occupancies of 30 days or longer. Pursuant to section 27-264 of the Administrative Code, the J-l occupancy group includes buildings that are primarily occupied on a day-to-day or week-to-week basis. Section 27-265 provides that occupancy group J-2 includes buildings that are primarily occupied on a month-to-month or longer term basis.
Defendants correctly note that, in the case of SROs, the Multiple Dwelling Law authorizes rentals for a minimum of seven days, and it appears that a small number of units may be rented on a week-to-week basis, but, if the SRO is a class A dwelling, then the unit rentals must as a rule be primarily for permanent occupancies of 30 days or longer (Multiple Dwelling Law § 4 [8] [a]; see also Finkelstein and Ferrara, Landlord and Tenant Practice in New York § 2:159 [West’s NY Prac Series, vol F, 2004] [Hotel Tenancies, “the term ‘tenant’ encompasses a resident of one or more rooms in a hotel who is not a transient occupant and who has been in possession for thirty consecutive days or longer”]; Mann v 125 E. 50th St. Corp., 124 Misc 2d 115, 117 [Civ Ct, NY County 1984, Lehner, J.], affd 126 Misc 2d 1016 [App Term, 1st Dept 1985] [“ ‘Transient’ has been considered the opposite of ‘resident’ and with respect to a hotel, is one who has a home elsewhere and is staying at the hotel for a short period in connection with a trip away from home” (citations omitted)]).

. Because the court finds that, given the certificates of occupancy, transient use of the buildings was not a legal use prior to the adoption of the current Zoning Resolution in 1961, and that the grandfathering provisions therefore do not apply, the court need not determine whether use of the subject buildings has been “open and notorious” and continuous.

. The fact that the subject buildings have a “director of marketing” is evidence that a significant portion of the subject buildings is being used as transient hotel/hostel accommodation.

. The court has fashioned the injunction prospectively, so that defendants have an opportunity to contact the prospective hotel guests and/or the third-party providers to cancel all reservations for the subject buildings that were to commence after January 8, 2008, thereby providing a reasonable amount of time to enable the tourists and their Internet providers to make alternate arrangements, and so that any arriving tourists, unaware of this order, would not, upon arrival, be forced to seek last-minute substitute accommodations during the busy holiday season.

. The fact that the defendants have apparently been operating in violation of the law for years does not mean that a preliminary injunction is not warranted. There is no estoppel against the City in its enforcement activities (City of Yonkers v Rentways, Inc., 304 NY 499, 505 [1952] [municipality not estopped from enforcing its zoning laws by the issuance of a certificate of occupancy or estoppel]; Matter of Parkview Assoc. v City of New York, 71 NY2d *395 274 [1988]). Accordingly, even if the City had not previously enforced its laws against the illegal transient use, it is not now estopped from commencing an action to enforce the Building Code and Zoning Resolution or from obtaining provisional remedies during pendency of the action. No one may claim entitlement to continue and benefit from a violation of the law; whether the violation began inadvertently, mistakenly, or deliberately, is irrelevant.

. This is not to suggest that defendants would incur any compensable damages, given the unlawful nature of the use being enjoined.

. Nothing in this decision should be construed as limiting the City’s administrative enforcement, including its right to order removal of violations, punish recalcitrance or issue a closing order if warranted.

. Even if the court were to apply the clear and convincing evidence standard not here required (see Procedural Matters, supra), this court would conclude that the City has met its burden.